Sewall, J.
This action, for two undivided sixth parts of a lot of land in Windham, is in the form of a writ of right. The demandants count upon the seisin of their father, Peter Colman, deceased, and a descent to them of the shares demanded, as an estate in fee simple. The tenant defends fifty acres on the southwesterly half of the lot of land demanded; and as to the residue, she pleads non-tenure and a disclaimer.
At a trial of the issue joined between these parties on the right in the part defended, the tenant, having in aid the title of the heirs at law of Edward Anderson, to whom she is guardian, obtained a verdict against the demandants. The case has since been brought oefore the Court, upon exceptions for the demandants to the decisions and opinions of the justice, before whom the cause was tried.
The evidence, as well for the demandants as for the tenant, is stated very much at large in these exceptions; but the result to which we have been led, after a careful examination of the case, will render unnecessary any observations upon that part of the evidence which relates to the title of the demandants. They are to be considered, in this inquiry, as maintaining their title and demand; unless the tenant has prevailed^ under a title acquired from their ancestor, or against him in his lifetime.
The title under which the tenant has been permitted to succeed, so far as to obtain a verdict in support of it, is of that kind almost proverbially denominated a collector's title, as expressing a case of doubt and "difficulty. And collectors’ titles must continue dubious and difficult, in the proof and evidence required to sup- [ *112] port them, so long as they remain * unassisted by any *121 other limitation than that which applies in a writ of right in common cases of disseisin.
The defence in this action is in the right of the widow and children of Edward Anderson; and an estate in fee simple in fifty acres, being the south-westerly end and half part of the lot demanded, is deduced to him, by several mesne conveyances, from one Caleb Graffam. His title was a deed to him, dated the 10th of February, 1780, made by Jonathan Loveitt, as constable of the town of Wind ham, by which he bargained and sold in fee to Graffam forty-six acres and thirty-seven rods, part of the premises defended; and another deed made by Ichabod Hanson, dated the 14th of the same February, by which, as constable of Windham, he bargained and sold to the said Graffam, in fee, forty acres and a half of the same lot of land. The part conveyed by Loveitt is located as next ad joining to a parcel of the same lot, mentioned to be thirteen and a half acres, before purchased by the said Graffam, which is understood to be at the north-easterly end of the lot, and therefore extends from that so far as to include at least nine acres beyond the centre line of the lot towards the south-westerly half part; and Hanson’s conveyance, although expressed to be of lands in common and undivided, yet in effect includes the residue of the lot.
These deeds are to avail, if at all, upon the legal authorities of the constables; and it was thought at the trial incumbent upon the tenant to prove all the circumstances requisite in the due execution of those authorities ; and this, notwithstanding the length of possession under these deeds, and the long acquiescence of the parties, otherwise entitled to the premises thereby conveyed. Nor is it, in fact, for the heirs of the original proprietor that this demand is prosecuted ; but, as appears from a deed introduced at the trial, for the use and benefit of one who has recently obtained a transfer and release of their title, whatever it may be.
The exceptions, which have been argued, suggest these two inquiries upon the evidence stated, each comprising a number of particulars.
* 1st. Whether the evidence admitted to the jury was [ * 113 ] not incompetent, and whether the verdict is not without the requisite evidence, in several particulars essential to the title under which the tenant holds. And,
2dly. Whether the directions to the jury upon the legal result of the evidence were not incorrect upon the facts proved.
Under the first head of inquiry may be comprised what relates to the warrants for calling the town meetings, at which the assessors and constables were elected, their qualifications or oaths ol *122 office, † and the deficiency of evidence, as to the tax acts, warrants, valuations, advertisements, &c.
And as to all these difficulties and objections, with which the trial was embarrassed, the Court are clear in the opinion that seals were not essential to warrants for town meetings; that town clerks had authority to qualify assessors and constables, the time specified being directory only, or respecting the right of the town to renew the appointment, and sue for the penalty to be recovered on refusal ; and that, having been sworn as constables, they were qualified in that respect to collect the taxes in question; (a) because constables were ex officio collectors, when no'other person is distinctly and exclusively appointed as collector; and that the judge, as to these and the other requisites of tax bills, valuations, warrants, &c., was right in submitting such evidence as there was, although incomplete ; and, if the jury were satisfied that the deficiencies in the evidence were not chargeable to the fault or negligence of the party, that nothing in the power of the party to produce was wilfully withheld, the jury were very properly instructed to consider every thing as proved, which might be rationally and fairly presumed from the facts and circumstances proved. In short, at the distance of time which had intervened between the constables’ sales and the trial, it was unreasonable to require evidence of the particu- [* 114] lars which the tenant in the *case at bar was put to prove; especially evidence from documents not intrusted with the party, or transferred with his title.
The case is, in this respect, within the principle of the decision by this Court in the case of Gray vs. Gardner, (1) where a title under an administrator’s sale wa? questioned; but the interval was not exceeding twenty-two years. (b)
As to the legal result of the facts proved, it must be understood, from the copies of the advertisements, upon which the jury were directed to consider the fact of advertising proved, that Loveitt first *123 advertised the amount of taxes on sundry lots in Windham, including the land now in question, which, being due, were in his hands to be collected. All persons are therein required to make payment to him, and, in default thereof, they are notified that their several lots will be sold as the law directs. This advertisement was dated the 2d of November, 1779, and appears to have been published as early as the 18th of the same month, and to have been continued three weeks successively. This, however, was not an advertisement of a sale, or of any time or place. But this was, as we apprehend, a sufficient compliance with the provisions of the tax act, as to the previous notice required to be given three weeks successively; and we adopt the construction contended for by the counsel for the tenant, that the term of one month applies entirely to the posting in some public place in the town.
*122 ADDITIONAL NOTE.
[Pruden vs. Allden, 23 Pick. 184. — Whitney vs. Sprague, 23 Pick. 198. — Battles vs. Holley, 6 Greenl. 145. — Green vs. Blake, 1 Fairf. 16. — Purrington, vs. Dunnings 2 Fairf. 174. — Jackson vs. Miller, 6 Wend. 228.---vs. Brooke, 8 Wend. 487 — F. H.]
*123 There is then a second advertisement by Loveitt, in which he gives notice to the owners of certain lots, among others in the second and third divisions, the same as before, and including again lot 86, that so much of the said land will be sold as to discharge the taxes set on said lots; the sale to be at the house of, &c., on the 31st day of January then next. This advertisement was dated, I presume, December 10, 1779. † And accordingly its first appearance in the paper must have been December 30, 1779 ; and *the three weeks successively brought the adver- [ * 115 ] tisement to the 13th of January, 1780, as the proof was of the continuance of the publication. The only question is, therefore, as to this objection, — whether the commencing of notice thirty days previous to the sale is a sufficient compliance with the law, which requires thirty days’ previous notice. And we are clear in the opinion that it is. The statute has not directed that the last publication shall be thirty days before the sale. It is sufficient, if the notice by posting advertisements commence thirty days before the day of sale, (a)
As to the omission, from both sets of advertisements, of the names of the proprietors, there is no evidence of any communication or knowledge of them. The name of the original proprietor of the right in the township, to whom the lot in question, was drawn, was, at that distance of time from the grant, no indication of the proprietor at the time when the taxes were assessed. And a statement of the sum assessed on the several divisions or lots was a sufficient compliance with the statute in this particular.
The difficulty upon Loveitfs advertisement, if the copy fur *124 nished me is correct, is, that it contains no specification of any hour of the day when the vendue was to be holden. On this point 1 have had some doubt; but upon the whole I think it is not to be insisted on. This precision is not explicitly required; and as far as advertisements for similar purposes are evidence of the construction given at the time, we must conclude that it was not then understood to be essential. The newspapers of that day are full of such advertisements, and a very considerable proportion of them express no notice of any hour of the day appointed for the sale.
Hanson's advertisement specifies the hour of the day appointed for the sale. In other respects his advertisements are upon a footing with Loveitt's; and the sales by both constables are, we think, warranted by the provisions of the statute, as to all the requisites of notice; that is, so we must understand the fact upon this verdict.
* It is also proved, as to the continental, state, and county taxes, that the assessments committed to Loveitt for 1778, and to Hanson for 1779, exceeded in the amount of each list the sums granted by the General Court, and by the Court of Sessions respectively. For instance, in 1778, of the tax granted in that year by the General Court, the part apportioned to the town of Windham was 2291. Os. Ad.; and, to provide therefor, the assessors made a list of assessments, as for the state tax, the aggregate of which was the sum of 242/. 5s. l$d., and Loveitt was directed by the assessors to pay to the state treasurer the said sum of 229/. Os. Ad-., and to the treasurer of Windham the residue, being 13/. 5s. 3id. Similar overlayings or surpluses are apparent in each assessment of the public taxes; that is, state and county taxes, as distinguished from the assessments for the town of Windham, and for their parish concerns.
It is also to be observed, that the warrant from the state treasurer, at that time necessary to the authority of the collector, directed and authorized, in each instance, the collection of the whole of the respective sums set on each particular person. The question, then, is, as to this objection, whether the legal result of this evidence is not, that these constables proceeded in their collections upon a void authority; because the warrants to them authorized the collection of assessments exceeding the powers of the assessors.
With a diligent inquiry, we have not found any statute provision, which enabled the assessors to enlarge the sum apportioned for the state or for the county, either to suit their convenience in calculating and forming the lists of assessments, or with a view to meet abatements, or defalcations and mistakes, and to insure the sum for the collection of which the assessors, the town, and the collector, became immediately answerable, to be obtained upon a warrant of distress *125 against them. Precautions under certain limits, some anticipations adequate to these purposes, it is obvious, would have been very reasonable; and if the assessors of Windham were in an error in this particular, it is a notorious * fact that the [ * 117 J error was a common one, and, as we believe, of long standing.
Failing to find any express provision at that day, we have been led to examine, with some deliberation, whether, upon general principles, this power, exercised by assessors, had not some warrant or authority; for it is hardly supposable that a practice which had obtained so generally, and for such a length of time, had been without any legal principle to justify it. But we are sensible, whatever latitude of presumption may be employed to supply perishable testimony and evidence of facts, the rules of law are to have some other support; and because in the statute of 1785, c. 50, § 11, which is the revised statute, concerning the power and duty of assessors, there is an express provision to the effect required, to answer the convenience of assessors in making their assessments, but with limitation as to the extent of this authority; and, as nothing similar is found in any former statute relative to this subject, it may be argued that none existed, and that former assessments with overlayings were wholly irregular. Yet, upon the whole, we cannot say that there was not necessarily implied, in the general duty and power of assessors, sufficient authority to meet the obvious occasion. We think these overlayings are to be regarded as appropriations by the town, intrusted with the assessors, to meet the particular expenses and liabilities to be incurred in assessing and collecting state and county taxes. (a)
If this power should be thought doubtful, still the general question recurs, Did this error vacate the assessment, to the effect of rendering it null and void? Were constables trespassers in enforcing the warrants of the state treasurer, in collecting the whole of the respective sums assessed on each particular person, according to the words of the warrant, and the duty which the state was by law authorized to exact ?
It is true that the office of an assessor is rather ministerial than judicial; but there are many particulars in which a * sort of judicial discretion is. permitted them. They [*118] are to exercise their judgment in stating the aggregate amount upon which the assessment is to be apportioned, in determining the ratable property, and the value of it, for which each *126 individual is to be assessed. An assessment is erroneous, if property is omitted in the valuation which ought to be assessed, or if property is overvalued which is liable to assessment, or an individual is charged by mistake, or even with bad intentions, with property for which he is not liable. But the collector or constable has no superintendence of the assessors, no power of correcting them, or of refusing the assessment upon a suspicion that these errors have happened. He is subjected to the control of the assessors, and obliged, under severe penalties, to receive the assessment, and to enforce it. according to the powers intrusted with him; among which is that of selling unimproved lands of non-residents, where the assessments remain unpaid after due notice And we see no distinction between the duty and authority of the constable or collector, in any of the cases within the scope of his warrant, whether thé payment be enforced by a sale of lands, or by a sale of chattels, or by an arrest. If a sale is void under his warrant for an error in the list of assessments, it would be void in every other case. He must be liable to an action for moneys as received under a void authority; and for a distrainer of personal chattels, or arresting the body of one assessed, he must be a trespasser.
Poor rates are apportioned and collected in England in a method analogous to that in use with us for direct taxes, whether state, county, or town, enforced by the assessments of the assessors appointed in the several towns.
The general principle adopted in England is, as resulting from me principles of the common law, that a defect in the rate will not avoid the warrant of distress upon it, so as to make those who grant, and those who exercise it, trespassers ab initio; not even where the rate was supposed to have been anticipated in point of [ *119 ] time, or estimated for a * longer period than was authorized ; because objections of this kind are proper subjects and cases of appeal. (2)
Where an-assessment, however, of a poor rate had been charged upon property not taxable by the statute, the justice who granted a warrant of distress, and the collector who executed it, to enforce that particular assessment, were holden liable to an action of trespass. (3) There, the 'case not being within the authority of the overseers, their assessment was void, and no foundation for the warrant of the justice or the proceedings of the collector. In England, the jurisdiction of abatements, of correcting lists of assessments, of setting them aside, and directing new assessments, is in the Court of General Sessions, to be exercised on the appeal of any *127 party aggrieved by an error in the assessment he is charged with, oi any error which affects the whole list.
In the case at bar, the property assessed was subject to the authority of the assessors. With us they have the power of abating, of correcting their lists after an assessment made. They are, as to all over-assessments, a court of special jurisdiction; and the consequence is, that, in every case within their power to decide, their warrant justifies the collector or constable, who is holden to execute it; and he does not incur the peril of their misdoings or wrong adjudications or estimates, in a case within their jurisdiction.
Upon the whole, the opinion of the Court is, that the overlaying, if an irregularity in the assessment, or an error in the judgment of the assessors, the case itself being within their geneval authority, will not vacate the warrant to the collector or constable. He is justified by the warrant; and the remedy, where any injury is sustained, is against the assessors. We think ourselves bound to view this case as within the reason of the decision in the case of Dillingham, vs. Snow, (4) where the error was an omission of ratable property from the list of valuations, by which each assessment was increased beyond its due proportion, (a) Here the increase * is an excess, as it is supposed, upon every assessment [ * 120 ] of the state and county taxes, because the aggregate ■ amount exceeds the whole tax to be assessed for that particular purpose; but no person liable is essentially injured, because the excc-ss, if recovez-ed, is answered for to the town treasury, and is in fact applicable, and must be applied to, and is generally exhausted by, defalcations and errors in the assessments, which are finally to be corrected by the judgment of the assessors, in allowing abatements and charges of collection.
The assessments in question were lawfully charged upon the town, and for which a warrant or order had been granted, to be exercised at the peril of the assessors, the towrn being liable for all deficiencies. There was no intention of assessing another and different sum ; but, to avoid the uncertainties incident to the assessments ; and because some are comprised in the list whose capacity to pay at all, or to pay the amount assessed upon them, is uncertain ; and because the assessment itself is liable to defalcations and errors, for which the assessment on the town must respond to the state and county treasuries; and because of possible errors in cal culations, — the list is issued, and the warrant executed upon it, notwithstanding the aggregate of al lthe assessments, if collect© 1, *128 would exceed the sums payable to the state and county treasurers ; the surplus, if collected, being to be paid to the treasurer of the town. It is reasonable in itself that this provision should be made ; but, if it was an unlawful anticipation, the error was in the judgment of those assessors who made the lists of assessments., (a) But that will not avoid the proceedings of the officer who acts under a warrant, suitable to the case, in enforcing the assessments.
The verdict is confirmed, and judgment is to be entered accordingly.

 ADDITIONAL NOTE.
[See Abbot vs. Hermon, 7 Greenl. 118. — Kellar vs. Savage, 5 Shepl. 444.— Tucket vs. Aiken, 7 N. H. 113.— Briggs vs. Murdock, 13 Pick. 305. — F. H.]

а) [Vide The Margate Pier Company vs. Hannam, 3 Barn, Aid. 267.— Ed.]

 3 Mass. Rep. 399.

 [Blossom vs. Cannon, 14 Mass. Rep. 177. — Pejepscut Proprietors vs. Ranon, 14 Mass. Rep. 145. — Knox AL vs. Jenks, 7 Mass. Rep. 488. — Ed.]

 In the copy, which came up in the case, this advertisement was dated 1778.

 [Vide Frothingham vs. March, 1 Mass. Rep. 247. — Bachelor vs. Bachelor, 1 Mass Rep. 256 — Welman vs. Lawrence, 15 Mass. Rep. 326. — Ed.]

 [Sed vide Iibby vs. Burnham, 15 Mass Rep. 144 —Stetson vs Kempton, 13 Mass. Rep. 272. — Ed.]

 1 Burr. 580. —2 D. & E. 560.

 2 D. & E. 374,

 5 Mass. Rep. 547.

 [Vide etiam Little vs. Greenleaf, 7 Mass. Rep. 236. — Sed vide Libby vs. Burnlam. 15 Mass. Rep. 144. — Stetson vs. Kempton, 13 Mass. p. 272. — Ed.]

 [Vide Henderson vs. Broxon, 1 Carnes’s Rep. 91. — The general rule of law, as to actions of trespass against persons having a limited judicial authority, is plain and clear. If they do any act beyond the limit of their authority, they thereby subject themselves to an action of trespass; but if the act be done within the limit of their authority, although it may be done through an erroneous or mistaken judgment, they are not thereby liable to such action. — Doswell vs. Impey & Al., 1 Burn. & Cresw. 163.—Ackerley vs. Parkinson, 3 Maule Selw. 411. — Basten vs. Carew, 3 Barn. & Cresw. 652. — Ex parte King, 15 Ves. 126. — The case of the Marshaser, 10 Co. 76 But see Lincoln vs. Hapgood Al., 11 Mass. Rep. 350. — Ed.]